NATHAN SEARS *vs.* P. ADAMS AMES & another.

Barnstable.   Jan. 26. — March 1, 1875.   AMES & ENDICOTT, JJ., absent.

In an action for the non-delivery of certain shares of stock in a corporation, it appeared that the defendant agreed to sell the shares to the plaintiff, and the plaintiff delivered in payment therefor a draft on a third person, to whom the de-fendant gave up the draft on receipt of a check on a bank. The bank refused to pay the check, and the defendant declined to transfer the stock, and did not tender back the check to the plaintiff until the trial of the action. *Held*, that the action could be maintained.

CONTRACT for the non-delivery of certain stock sold by the defendants to the plaintiff. Trial in the Superior Court before *Dewey*, J., who, by consent of the parties, before verdict, reported the case for the determination of this court in substance as fol-lows :

The plaintiff, on March 4, 1874, went to the office of the defendants, who were bankers and brokers, in Boston, under the firm name of Page, Richardson & Co., and had some conversation with the defendant, Abbot, as to an investment which he desired to make. Among other stocks which were suggested, was the stock of the Chicago, Iowa and Nebraska Railroad Company, and the plaintiff desired to know at what price it could be purchased. Abbot replied that they had none, but would inquire and ascertain its price. The same afternoon the plaintiff went to the defendants' office, and was informed by Abbot that he could buy the stock for about $95. The plaintiff thereupon ordered Abbot to buy for him forty shares of the stock, at $95 a share, and on the next day was informed by him that he had got it at that price. On March 6, about eleven in the morning, the plaintiff went to the office of the defendants and gave Abbot two drafts on Paul Sears for $3800, and received from him the following memorandum: " Boston, March 6, 1874. Sold Nathan Sears 40 shares Chicago, Iowa & Nebraska Railroad, at $95. $3800. Paid, March 6, 1874. Page, Richardson & Co." Abbot gave the drafts at once to his office boy, with orders to carry them to Mr. Sears's office and get the money. The office boy returned with a check on the Tremont National Bank of Boston for $3800, payable to the defendants, and signed by George T. Sears. The drawer of this check being unknown to Abbot, he sent the check immediately by a clerk to the bank on which it was drawn for collection, instructing the clerk to get either large bills or a certificate of deposit. The clerk presented it at the bank and asked the paying teller to give him either large national bank bills or greenbacks. The teller replied that he would do nothing of the kind, and offered to pay the check in small national bank bills, being bills of the denomination of one or two dollars ; these the clerk refused to receive, and applied to the cashier of the bank, with the same request that he had made to the teller, and received from him the same offer and refusal. Whereupon he returned the check to Abbot as unpaid. The clerk did not specifically demand greenbacks for the check.

Abbot notified the plaintiff of the refusal to pay the check and that they had not on that account transferred the stock to him. In relation to the pecuniary ability of Paul Sears, the de-

fendant, Abbot, testified that he had known of Paul Sears, had heard of him as a man of means. Fiske, the clerk of the defendants, testified that he had heard of Paul Sears as a man of means. The plaintiff testified that he had money deposited with Paul Sears, and that he was considered a man of means ; that George T. Sears, the drawer of the check, was the agent of Paul Sears.

The defendants contended that, at the time the memorandum was given, they were not the owners of the shares therein specified, or authorized by any owner of such shares to sell or transfer them, and that the contract was void under the Gen. Sts. *c.* 105, § 6. Abbot testified that when he made the memorandum the defendants did not own the shares, but that after receiving the plaintiff's order, he had seen one Sampson, who owned a large number of shares, and had ascertained from him that he would sell him forty shares at $95 a share, and that he made the memorandum as he did, because he knew he could get them. The plaintiff testified that on March 5, at the interview above referred to, Abbot said to him, " It is all right ; I have got the shares, but they are in a larger certificate, and they will have to go West to be transferred, and it will take something like a week to transfer them to you. I will have it done, and forward certificate to you. Come in tomorrow, and we will settle up the transaction." The parties not agreeing as to whether the defendants were the owners of the stock or authorized by the owner to sell, or to transfer the certificate of said shares of stock, on March 6, the judge submitted to the jury the following question : " Were the defendants, on March 6, 1874, at the time of making the bill of sale, or memorandum of sale as to the stock, the owners or assignees of the stock, or authorized by the owner or assignee, or his .agent, to sell or transfer the certificate of shares of stock?" To this question, the jury answered, " Yes."

The check was never paid, and the defendants have never received anything from the plaintiff, except the drafts, which were given up to Paul Sears when the check was received. The check has been retained by the defendants, and not tendered to the plaintiff until the trial, when it was so tendered in court, and the plaintiff not receiving said check demanded the drafts.

If, upon the fact found by the jury, and the evidence reported, the jury would have been authorized to find a verdict for the

plaintiff, judgment is to be entered for the plaintiff for $3800, and interest from March 6, 1874; otherwise, judgment for the defendant.

*J. M. Day*, for the plaintiff.

*M. Storey*, for the defendants.

DEVENS, J.  Assuming that the defendants are justified in treating the conversation that took place when the check was presented for payment as a refusal by the bank, they do not establish a defence to this action.  As the drafts of the plaintiff were in the hands of the drawee by their act, it was their duty, upon the dishonor of the check received by them, promptly to tender it back and demand the drafts, or else to transmit it to the plaintiff, and thus enable him to do so.

It could not be expected that Paul Sears, the drawee, would return the drafts, or would pay the money due the plaintiff so long as the defendants retained this check.  While thus retained, he had a right to insist that its amount should be allowed in his account.  By keeping possession of the check, the defendants therefore, in effect, kept the money of the plaintiff.  The complication which thus arose was caused by their neglect to do what they should have done, and the plaintiff was not compelled to accept the tender of the check at the trial.

*Judgment for the plaintiff*.